2015-1317

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

GEVO, INC.

Appellant,

v.

BUTAMAX™ ADVANCED BIOFUELS,

Appellee.

**Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in *Inter Partes* Review No. IPR2013-00214**

BRIEF OF APPELLEE
BUTAMAX™ ADVANCED BIOFUELS LLC

Deborah A. Sterling
Paul A. Ainsworth
STERNE, KESSLER, GOLDSTEIN & FOX, PLLC
1100 New York Avenue, N.W.
Washington, D.C. 20005
(202) 772-8501

*Counsel for Appellee, Butamax Advanced Biofuels LLC*

Dated: June 18, 2015

## AMENDED CERTIFICATE OF INTEREST

Counsel for Butamax Advanced Biofuels LLC, certifies the following:

1. The full name of every party or amicus represented by me is:

   **Butamax Advanced Biofuels LLC.**

2. The name of the real party in interest represented by me is:

   **Butamax Advanced Biofuels LLC.**

3. All parent corporations and publicly held companies that own 10 percent or more of stock of the party or amicus curiae represented by me are:

   **E. I. DuPont de Nemours and Company; and**

   **BP Biofuels North America LLC, an indirect subsidiary of BP plc**.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   **Sterne Kessler Goldstein & Fox PLLC**: Deborah A. Sterling, Paul A. Ainsworth, Peter A. Jackman

Dated: June 18, 2015

/s/Deborah A. Sterling
Deborah A. Sterling

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ............................................................1

STATEMENT OF JURISDICTION .............................................................1

STATEMENT OF THE ISSUES ..................................................................1

INTRODUCTION .....................................................................................2

STATEMENT OF THE CASE .....................................................................6

COUNTER-STATEMENT OF FACTS ..........................................................8

    I.   The '588 Patent .......................................................................8

    II.  The Board's Claim Construction ..............................................10

    III. Level of Skill in the Art ........................................................11

SUMMARY OF THE ARGUMENT ............................................................12

ARGUMENT..........................................................................................14

    I.   The Board Considered and Rejected Gevo's Arguments that the Prior Art Did Not Render Obvious Recycling Water from the Separator to the Fermentor ............................................................15

        A. There is Substantial Evidence in the Record to Support the Board's Determination that the Art Taught Recycling Water to the Fermentor ...............................................................15

        B. Dr. Daugulis's Testimony Fully Supports the Board's Findings ...19

        C. A POSA Would Not Need to Conduct Mathematical Simulations Before Concluding that Water Could Be Recycled to the Fermentor ...............................................................20

    II.  Substantial evidence supports the Board's determination that English and Maiorella teach a "pretreatment unit" ...................................22

CONCLUSION.......................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ................................................... 12

*In re Gleave*, 560 F.3d 1331 (Fed. Cir. 2009) ......................................................... 11

*In re Icon Health & Fitness, Inc.*, 496 F.3d 1374 (Fed. Cir. 2007). ........................ 21

*In re Jolley*, 308 F.3d 1317 (Fed. Cir. 2002) .......................................................... 12

*In re Merck & Co., Inc.*, 800 F.2d 1091 (Fed. Cir. 1986) ........................................ 21

*In re Zurko*, 258 F.3d 1379 (Fed. Cir. 2001) .......................................................... 12

*KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) ................................... 20

*Para-Ordnance Mfg., Inc. v. SGS Imps. Int'l, Inc.*,

73 F.3d 1085 (Fed. Cir. 1995) .................................................................................. 11

## STATUTES

35 U.S.C. § 103(a) ................................................................................................. 6, 7

## STATEMENT OF RELATED CASES

Counsel for Appellee Butamax Advanced Biofuels certifies that there has been no other appeal in or from this proceeding that was previously before this or any other appellate court. The patent at issue in this proceeding, U.S. Patent No. 8,304,588 ("'588 patent"), is a continuation of U.S. Patent No. 8,101,808, which is the subject of *Inter Partes* Reexamination Control No. 95/000,666 currently on appeal to the Patent Trial and Appeal Board ("Board"). That case may be affected by this Court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

Appellee Butamax Advanced Biofuels LLC ("Butamax") agrees with Appellant Gevo, Inc.'s ("Gevo") statement of jurisdiction. (Gevo Br. at 1.)

## STATEMENT OF THE ISSUES

1.    Whether substantial evidence supports the Board's determination that the prior art of record taught returning a water-rich liquid phase to a fermentation unit following separation of a water-rich liquid phase from an isobutanol-rich liquid phase.

2.    Whether substantial evidence supports the Board's determination that the prior art of record taught pretreating a feedstock to form fermentable sugars in a pretreatment unit.

- 1 -

# INTRODUCTION

Appellant Gevo's '588 patent relates to techniques used in the production and recovery of alcohols. The techniques at issue here—fermentation, fermentation product separation, and recycling of water—are all well known, having been used for decades in the production of alcohols, such as butanol, and ethanol.

The large-scale production of $n$-butanol and ethanol, for example, by fermentation was developed roughly a century ago. (A950.) The production of an alcohol by fermentation is straightforward: a feedstock such as cane sugar or sugar beet is converted into sugar by an enzyme, and a microorganism (e.g., yeast) metabolizes the sugar to produce an alcohol. (A175-76, 1:13-19, 2:58-3:5.) Once produced, it is necessary to separate out the alcohol from the fermentation medium. (A176, 3:13-27.) If the alcohol produced was $n$-butanol, for example, the "usual strategy" would be distilling the fermentation medium to produce a vapor comprising $n$-butanol and water, followed by condensing the $n$-butanol/water vapor to form a liquid bi-layer of $n$-butanol and water, and decanting the $n$-butanol from the bi-layer. (A878:6-13; A950.)

More recently, microorganisms recombinantly-engineered to produce renewable isobutanol were developed. (A765, Abstract.) Renewable isobutanol offers significant potential benefits for the manufacture of transportation fuels as well as other renewable chemicals. (A767, ¶¶ [0003]-[0004]; A192, ¶ [0003]-

[0004]; A529-30, ¶¶ 18-21.) And importantly, when recovering isobutanol, the separation strategy would be "roughly the same" as that for *n*-butanol: distill, condense, and decant. (A905:13-A906:4.) In fact, the techniques used to produce and separate ethanol or *n*-butanol were known to be applicable to the production and recovery of isobutanol. (A780-81, ¶[0183]-[0187].) Indeed, the art even suggested the possibility of retrofitting ethanol plants to produce that butanol. (A183.)

Against this prior art background, the '588 patent attempted to claim methods that use combinations of known techniques to produce and recover renewable isobutanol. The '588 patent claims require producing isobutanol using a microorganism. (A107-08, '588 patent, claim 1.) The first step, therefore, is to generate a food source for those microorganisms. (*Id.*) To do that, the '588 patent claims pretreating feedstock to produce sugars. (*Id.*) The microorganisms use those sugars to produce isobutanol in a fermentor. (*Id.*)

Once the isobutanol is produced through fermentation, the '588 patent claims move to the second step, separating out the isobutanol from the fermentation unit. (*Id.*) In short, the '588 patent claims distilling, condensing, and separating to arrive at two liquids, an isobutanol-rich liquid phase and a water-rich liquid phase. (*Id.*) The isobutanol-rich liquid phase is the desired product. The water-rich liquid phase is a byproduct that can either be discarded or reused. (*Id.*)

After a full hearing and with a full record, the Board determined that claims 1-28 of the '588 patent are unpatentable as obvious in view of two prior art combinations identified in Grounds 1 and 2 of Butamax's Petition. (A65; A69.) Ground 1 was based on English (A172-80), D'Amore (A184-203), and Hess (A181-83). Ground 2 was based on Maiorella (A204-26), D'Amore, and Hess. Gevo requests relief from the Board's determination with respect to only claims 1-14 and 27.[1] (Gevo Br. at 1-2.) Gevo's arguments are two-fold.

Gevo first argues that the Board erred in determining that the English, D'Amore, and Hess or Maiorella, D'Amore, and Hess taught a skilled artisan to recycle the water-rich liquid phase back to the fermentor following its separation from the isobutanol-rich liquid phase. (Gevo Br. at 14-20.) This is the '588 patent's

---

[1] During the proceedings below, Gevo never separately argued the patentability of any dependent claim, including claim 27, electing instead to rely on its arguments for independent claims 1 and 14. (A294-95; A389, 402-403.) Furthermore, Gevo's request for relief is unclear. In its Statement of the Issues, Gevo asserts the Board erred in finding claims 1-13 and 27 (issue 1) and 1 and 14 (issue 2) obvious. Yet Gevo's statement of relief sought judgment that only claims 1, 14, and 27 are valid.

step (iii), which recites "returning said water-rich liquid phase to the fermentation unit." (A108, claims 1, 14, and 27.) The Board found this step to be taught by the both prior art combinations based on overwhelming evidence of record.

Recycling a water-rich liquid phase is not new. English, a 1980 patent, describes an ethanol production process in which an ethanol-rich liquid phase and a water-rich liquid phase is produced in a separator. (A50-51; A178, English, 7:33-8:36.) This water-rich liquid phase is then recycled back to a fermentor. (*Id.*) Maiorella, a 1983 article on ethanol separation, similarly describes returning a water-rich liquid phase from an "ethanol recovery device (membrane separator, extractor, or flash vessel)" back to a fermentor. (A54; Maiorella, A206.) D'Amore, a published patent application, described an isobutanol production process in which a water-rich liquid phase, produced from condensing and separating out isobutanol from water, is recycled. (A195-96, D'Amore ¶ [0057].)

Upon this record, the Board found that these two combinations of references disclose or teach a person of ordinary skill in the art to recycle a water-rich liquid phase generated in an isobutanol production process back to a fermentor. (A59, A66-67.) Furthermore, the Board determined that "there are a finite number of places to send the water-rich liquid phase, and the fermenter is a viable option." (A59.) Gevo criticizes this determination as resting on only "hindsight" notwithstanding the express teachings of the art and supporting expert testimony.

Gevo's second argument is that the Board erred in finding that the prior art disclosed a "pretreatment unit," which is simply the location where pretreating a feedstock to generate fermentable sugars occurs. (A57; A66-67, Gevo Br. at 20-21.) Gevo does not dispute that the art taught pretreating a feedstock to form fermentable sugars. Instead, Gevo criticizes the art for not specifically illustrating this pretreatment unit in any schematics. (Gevo Br. at 20-21.) This criticism, however, ignores the prior art's explicit disclosure of pretreatment. (A175-76, English, 2:58-3:5; A222, Maiorella.) This pretreatment must occur somewhere. And that somewhere is the pretreatment unit. The prior art's failure to use the term "pretreatment unit" does not undercut the Board's determination, which is supported by substantial evidence and common sense.

## STATEMENT OF THE CASE

This appeal stems from an *inter partes* review of the '588 patent. Butamax's petition for *inter partes* review asserted two grounds of unpatentability with respect to claims 1-28. The Board instituted trial on both grounds. (A318-319.) Ground 1 asserted all claims to be unpatentable as obvious under 35 U.S.C. § 103(a) over U.S. Patent No. 4,3498,628 ("English") (A172-80) in view of *Chemical and Engineering News*, p. 9 (June 26, 2006) ("Hess") (A181-83) and U.S. Patent Application Publication No. 2008/0132741 ("D'Amore") (A184-203.) (A44.) Ground 2 asserted all claims to be unpatentable as obvious under 35 U.S.C.

§ 103(a) over *Biotechnology and Bioengineering*, 26:1003-1025 (1983)

("Maiorella") (A204-26) in view of Hess and D'Amore. (A44.)

Patent Owner's Response made several arguments in support of the patentability of independent claims 1 and 14. (A375-403.) For each of Grounds 1 and 2, Gevo argued, *inter alia*, (1) that the prior art did not teach recycling from a separator to a fermentor, and (2) that the prior art did not disclose pretreating a feedstock in a pretreatment unit. (*Id.*)

Following a full trial on the merits, the Board issued a final decision, finding all claims to be obvious in view of the prior art combinations in Grounds 1 and 2. (A64-65, A69.) Butamax urged and the Board agreed that "Butamax has shown that the combination of English, Hess, and D'Amore teaches or suggests all the limitations of claims 1-28." (A65.) Similarly, the Board found that "Butamax has shown by a preponderance of the evidence that claims 1-28 would have been obvious over the combination of Maiorella, Hess, and D'Amore." (A69.) It also found that "one skilled in the art would have had a reason to combine these references and would have had a reasonable expectation that the modified method be successful in producing isobutanol." (A60-67.)

The Board considered, addressed, and rejected Gevo's arguments that the art did not teach a pretreatment unit or recycling water back to a fermentor. (A56-59; A66-67.) The Board's final decision contains a thorough discussion of the art and

also of Gevo's various arguments. (*Id*.) Importantly, the Board's determination is

independently supported by the documentary evidence, in addition to the

testimonial evidence. (A56-69.) Indeed, to support its conclusion, the Board cited

to the specific disclosures in English, D'Amore, and Maiorella that disclose each

and every limitation, and to the testimony of both Gevo's and Butamax's experts.

(A56-59, A65-66.) The Board's reliance on this substantial body of evidence and

the underlying factual determinations deserves deference and cannot be ignored.

## COUNTER-STATEMENT OF FACTS

### I.    The '588 Patent

The '588 patent is entitled "Recovery of Higher Alcohols from Dilute

Aqueous Solutions." It issued on November 6, 2012, based on an application filed

on January 5, 2012. (A71.) On its face, the '588 patent claims priority to a

provisional application filed on December 27, 2007. (*Id.*) The '588 is directed to

the "production and recovery of C3-C6 alcohols at low capital and reduced

operating costs." (*Id.*, abstract.)

The '588 patent claims methods for continuous production and recovery of

renewable isobutanol in a retrofitted ethanol plant. (A529-30; A71; A107-08.)

These methods generally use a genetically modified microorganism that converts a

food source, for example sugar, into isobutanol. (*See, e.g.,* A78, '588 patent, 3:61-

4:20.) Once isobutanol is produced, the claimed methods use various techniques to

separate out and recover isobutanol for further unclaimed uses. (*See, e.g.,* A79,

'588 patent, 5:28, 6:28-41.) Some of the claimed methods recycle water. (A80,

A107-08, '588 patent, 8:42-44, claim 1.)

During original prosecution, Gevo presented the following schematic to

illustrate "exemplary embodiment[s]" of independent claim 1:

**<u>Claim 1</u>**



(A607.) According to Gevo, claim 1 provides an "integrated method for recovering

isobutanol during fermentation, while returning isobutanol depleted streams

(containing viable microorganisms) to the fermentor so that the … process does

not deplete the fermentor of water and viable microorganisms." (*Id.*)

As Gevo's own schematic shows, the claimed method begins in a pre-

treatment unit. According to the claims, this step involves "pretreating a feedstock

to form fermentable sugars in a pretreatment unit." (A107, '588 patent, claim 1.)

The patent explains that "[a]ny feedstock that contains a fermentable carbon source

is suitable for embodiments of the present invention…." (A87, '588 patent, 21:45-47.) For example, suitable feedstocks can be "starchy crops, such as corn and wheat, sugarcane and sugar beet…." (A87, '588 patent, 21:51-54). In some instances, these feedstocks may need to undergo a treatment, such as saccharification or enzymatic hydrolysis, to separate the carbon source from the other components of the feedstock. (A87, '588 patent, 21:55-59).

After pretreatment, Gevo's claimed method recites the standard steps of fermentation, distillation, and separation to produce an isobutanol-rich liquid phase. (A107-08, claims 1-28.) A natural byproduct of this process is a water-rich liquid phase. (A85, '588 patent, 17:16-19.) In the instant claims, this water-rich liquid phase is returned to the fermentation unit where it can be reused. This recycling step enhances the efficiencies by conserving water and, thereby, reducing operating costs.

## II.    The Board's Claim Construction

In its Decision to Institute, the Board construed three claim terms: "fermentation medium," "retrofit ethanol production plant," and "pretreatment unit." (A306-09.) The only claim term of relevance to this appeal is "pretreatment unit," which the Board construed as "the location where the feedstock is pretreated to form fermentable sugars." (A309.) Gevo has not appealed any of the Board's constructions. (Gevo Br. at 1-2.)

### III.    Level of Skill in the Art

Butamax's Petition explained that a person of ordinary skill in the art ("POSA") typically would have a Ph.D. in Chemistry, Chemical Engineering, or a similar related discipline and would have experience in distillation or fermentation and/or alcohol production. (A119-20.) Alternatively, a POSA would have a Bachelor's degree in Chemistry, Chemical Engineering, or a similar related discipline and substantial experience in an industry involving distillation or fermentation and/or alcohol production. (A119-20; A528, ¶ 16.) Gevo does not dispute the level of ordinary skill in the art. Indeed, Gevo's expert, Dr. Lucia, explicitly agreed with it. (A1862, ¶ 7.)

### STANDARD OF REVIEW

This appeal presents a simple case of judicial review of an administrative agency's factual determinations. What the prior art discloses is a factual inquiry. *Para-Ordnance Mfg., Inc. v. SGS Imps. Int'l, Inc.*, 73 F.3d 1085, 1088 (Fed. Cir. 1995). This Court's review of such determinations is "deferential" under the "'substantial evidence' standard of review." *In re Gleave*, 560 F.3d 1331, 1335 (Fed. Cir. 2009).

Gevo's entire appeal is a dispute over the Board's factual findings. In essence, Gevo disagrees with the Board's weighing of the evidence presented at trial. This Court should affirm the Board's decision if it is supported by substantial

evidence. *See In re Zurko*, 258 F.3d 1379, 1384 (Fed. Cir. 2001) ("Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

It is not enough for Gevo to show that a different conclusion would have been reasonable: "If the evidence in [the] record will support several reasonable but contradictory conclusions, we will not find the Board's decision unsupported by substantial evidence simply because the Board chose one conclusion over another plausible alternative." *In re Jolley*, 308 F.3d 1317, 1320 (Fed. Cir. 2002).

## SUMMARY OF THE ARGUMENT

This Court should affirm the Board's determination that the prior art taught or rendered obvious each and every limitation of the '588 patent.

Gevo devotes most of its brief to its assertion that the Board erred in finding that the prior art taught or suggested recycling a water-rich liquid stream from a separator back to a fermentor. This argument is meritless. Gevo does not contend that the '588 patent is the first to describe recycling a water-rich liquid stream from a separator. Nor does Gevo contend that the '588 patent is the first to describe recycling a water-rich liquid stream to a fermentor. Nor does Gevo contend that the '588 patent is the first to describe the use of recycling in the context of an isobutanol production process. Rather, Gevo apparently contends that the only

plausible reason for the Board to combine these well-known techniques in an isobutanol production process is through the use of hindsight. But the evidence shows that the prior art taught these techniques, that the options for where to recycle a water-rich liquid stream were finite, and the choice to send a recycled stream from the separator to the fermentor was a viable option and obvious. Any differences between what the prior art taught with regard to recycling water and what the '588 patent claims are trivial and Gevo's arguments to the contrary are unfounded.

Gevo next contends that the art does not teach or suggest a pretreatment unit –*i.e.* a location where the pretreatment of feedstock occurs. This argument strains all credibility. Gevo does not dispute that the art disclosed pretreating a feedstock to product fermentable sugars. Rather, Gevo apparently criticizes the art for not illustrating the place where such pretreatment occurs. But the pretreatment must occur somewhere. And wherever that occurs, is the pretreatment unit. The Board rightly rejected this nonsensical argument that the prior art teaches pretreating but that this pretreating is done anywhere but not a pretreatment unit.

# ARGUMENT

The Board's determination that the '588 patent is invalid because each and every claim would have been obvious in light of the prior art is fully supported by the record. This is because the '588 patent merely claims broad, well-known techniques to produce isobutanol by fermentation

The combination of English, D'Amore, and Hess teach a POSA each of these techniques, rendering obvious the '588 patent's claims. (A64-65.) For example, English details an ethanol production plant that uses pretreatment, fermentation, distillation, and recycling water. (A172, English, Abstract.) While English's explicit disclosure is for ethanol production, English makes clear that its "invention is also suitable for the preparation of other alcohols…such as butanol" (A176, English, 3:66-4:4.) Isobutanol is one of the isomers of butanol. (A950.) D'Amore describes the production of isobutanol by fermentation, distillation, condensation, and separation, along with recycling water. (A193-96, D'Amore, ¶¶ [0023], [0037]-[0038], [0057].) Hess teaches retrofitting an ethanol plant for producing butanol. (A183.)

The combination Maiorella, D'Amore, and Hess similarly teach a POSA the techniques claimed in the '588 patent. (A65-69.) Maiorella, like English, describes an ethanol production process using pretreatment, fermentation, and distillation. (A53-55; A204, Maiorella, Abstract.) Indeed, the Board's determination that a

POSA would have a reason to combine the prior art with an expectation that doing so would successfully produce isobutanol is unchallenged.

The combined teachings of these references fully support the Board's conclusions that the claimed recycling step and a pretreatment unit are taught and rendered obvious by the prior art.

## I. The Board Considered and Rejected Gevo's Arguments that the Prior Art Did Not Render Obvious Recycling Water from the Separator to the Fermentor

The Board determined that the prior art combinations of both Ground 1 and Ground 2 taught a POSA to return the water-rich liquid phase to the fermentor after isobutanol is distilled and separated out from the water. (A59; A66-67.) Gevo challenges this determination as lacking substantial evidence in the record. Gevo's arguments fail for several reasons.

## A. There is Substantial Evidence in the Record to Support the Board's Determination that the Art Taught Recycling Water to the Fermentor

Gevo's brief ignores the substantial evidence of record supporting the Board's determination that the prior art renders obvious recycling a water-rich liquid phase to a fermentor after isobutanol is distilled and separated out from the water. (A59; A66-67.) Gevo's "hindsight" criticisms of the Board are unjustified. (Gevo Br. at 14.)

It is undisputed that the prior art teaches recycling a water-rich liquid phase to a fermentor after separating out water and an alcohol from a mixture. English, for example, teaches producing ethanol in a process that includes "continuously transferring a portion of the fermentation medium to a separator…and recycling part or all of the remaining fermentation medium to the fermentor." (A175, English, 1:63-2:2.) Similarly, Maiorella discloses an ethanol production process that results in the production of "an ethanol depleted beer for recycle to the fermentor." (A206, Maiorella.)

The Board recognized that "English discloses a process with simultaneous fermentation and ethanol recovery" in which "ethanol is removed from the stream at a separator, and the remaining fluid is returned to the fermentor." (A57; A176, A178, English, 4:14-19, 7:42-27.) Specifically, the Board found that "English teaches tapping off '*some* of the fermentation medium issuing from the separator' in order to maintain the water balance in the fermentor." (A57; A177, English, 6:11-14.) Therefore, the Board reasonably found that "drawing off a portion of the fluid confirms that the rest of the fluid is indeed recycled back to the fermentor." (A57; A173-74, English, Figs. 1 and 2.) Likewise, the Board recognized that Maiorella describes an "ethanol depleted beer for recycle to the fermentor" and that "recycling the microorganism cells to the fermentor increases productivity and reduces costs." (A54 (internal citations omitted).)

English and Maiorella thus disclose recycling back to a fermentor the water-rich liquid phase that remains after alcohol is separated out, as contemplated by step (iii). What English and Maiorella expressly lack, however, is that this recycling is done after steps (i) and (ii). That is because in an ethanol production, as detailed by English and Maiorella, there is no need to do steps (i) and (ii). To produce isobutanol, however, steps (i) and (ii) are necessary due to the chemical interactions between isobutanol and water. (A950; A532, ¶ 29; A878:6-13, A880:17-21.)

D'Amore describes a process in which isobutanol and water are separated by using a condenser (step (i) of claim 1) and a decanter (step (ii) of claim 1) resulting in a "lower phase **122** that is approximately 94% by weight water." (A195-96, D'Amore, ¶ [0057], Fig. 2.) This lower phase becomes the "reflux stream…introduced near the top of beer column **108**." (*Id.*) That is, D'Amore discloses condensing an isobutanol-water mixture, separating the mixture into two streams—an isobutanol-rich stream and a water-rich stream—and then recycling the water-rich stream to conserve resources. (*Id.*) A point with which Dr. Lucia and Dr. Daugulis agreed. (A888-8; A559-60, ¶ 100-01; A563-64, ¶ 113.)

In short, English and Maiorella teach recycling a water-rich liquid phase from a separator to a fermentor during ethanol production. (A57; A176, A178, English 4:14-19, 7:42-27; A206, Maiorella.) D'Amore teaches the additional

separation steps needed to recover isobutanol, and teaches recycling a water-rich liquid phase from a separator to a beer still instead of to the fermentor as the '588 patent claims require. (A195-96, D'Amore, ¶ [0057], Fig. 2.)

The Board's determination that a POSA would have the motivation to combine D'Amore with English or Maiorella (along with Hess) and have a reasonable expectation in successful producing isobutanol is unchallenged. (A60-67.) Combined, these references therefore disclose a process in which isobutanol is produced via fermentation (steps (a) and (b) of claim 1 of the '588 patent), separated by distillation (step (c)), condensed (step (i)), and then separated to produce an isobutanol-rich liquid phase and a water-rich liquid phase (step (ii). (A56-59; A65-67.)

The choice then of what to do with the water-rich liquid phase is the only challenge Gevo presents. (Gevo Br. at 14-20.) A POSA could either throw the water-rich liquid away, or as English, Maiorella, and D'Amore suggest, recycle the water somewhere. (A50-51; A178, English, 7:33-8:36; A54; A211, Maiorella; A195-96, D'Amore ¶ [0057]; A559, ¶38; A563, ¶ 113.) The Board's conclusion that a POSA would choose to recycle is fully supported by English, Maiorella, and D'Amore. (*Id.*)

Further supporting the Board's conclusions, and in agreement with Dr. Daugulis's declaration, Gevo's expert Dr. Lucia admitted that English teaches that

"it is desirable to conserve water during the conservation process" (A884:22-885:8) and that a POSA would consider minimizing the amount of water used as "one goal" in terms of optimizing an extraction process (*Id.*)

Based on English and Maiorella, the Board concluded that one viable option of where to recycle the water-rich liquid phase is the fermentor. (A59.) Besides being an expressly disclosed option, there are only "a finite number of places to send the water-rich liquid phase, and the fermentor is a viable option." (A59.)

The Board therefore determined that the prior art taken as a whole disclosed recycling a water-rich liquid phase that results from separating out water and an alcohol, *e.g.*, isobutanol, in a process that uses a condenser and decanter. (A59; A69.) The facts show that Gevo's argument that the Board's conclusions are based in hindsight or is unsupported by substantial evidence is wrong and contrary to the record.

### B.    Dr. Daugulis's Testimony Fully Supports the Board's Findings

Gevo also gets it wrong when it argues that Dr. Daugulis's testimony somehow undermines the Board's determination. (Gevo Br. at 19.) Gevo confuses Dr. Daugulis's testimony regarding locations in a system from where water can be drawn with those locations to which water can be sent.

Based on the evidence, the Board determined that there are a finite number of places to send a water-rich liquid phase and of these the fermentor is a viable

option. (A59.) Dr. Daugulis testified that there are several places where water-rich liquid is available for recycling. (A1823:15-A1816:15.) But he identified only a finite number of places where a recycled water-rich liquid stream could be sent. (A546, ¶ 65; A564, ¶ 115.) And the fact that the fermentor is one such option is confirmed by the prior art of record. (A564, ¶ 115.)

Dr. Daugulis's testimony, therefore, does nothing to undermine the Board's determination. Indeed, even the schematic Gevo presents in its brief shows that there are only a small number of places one could possibly recycle water back, including the fermentor. (Gevo Br. at 8, Figure A.)

## C. A POSA Would Not Need to Conduct Mathematical Simulations Before Concluding that Water Could Be Recycled to the Fermentor

Gevo argues that Dr. Daugulis failed to perform "any computer modeling" to support his opinions concerning recycling streams and, therefore, his analysis is inadequate. (Gevo Br. at 18-20.) To the extent Gevo contends that a finding of obviousness of the instant claims requires computer modeling or other mathematical calculations, this misstates the standard for obviousness. Neither the challenged claims nor the law require such a showing. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 419-22 (2007).

In an obviousness analysis, courts "do not ignore the modifications that one skilled in the art would make to a device borrowed from the prior art." *In re Icon*

*Health & Fitness, Inc.*, 496 F.3d 1374, 1382 (Fed. Cir. 2007). That Dr. Daugulis did not perform any calculations to determine how efficient a retrofitted plant would be does not alter the design choices available to the skilled artisan based on the prior art. (A1818:22-A1819:3.) This is particularly true here because none of the claims recite any specific operational efficiencies.

Furthermore, it has long been settled that "[o]bviousness does not require absolute predictability." *In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986). Yet that is precisely the standard Gevo applies by arguing that Dr. Daugulis "did not support his Declaration with any type of computer modeling (i.e., calculations)" or that "Dr. Daugulis concedes that he would not be able to determine whether recycling water from a decanter to the fermentor…is even required." (Gevo Br. at 17-18.)

Additionally, it is incorrect that Dr. Daugulis "did not provide the type of evidence that a POSA (such as himself) would require to support his conclusions." (Gevo Br. at 18.) This is simply not the case. Gevo's citation is merely to Dr. Daugulis's statement that he did not perform simulations as part of his testimony in this proceeding. (A1596:18-20, 23-24; A1598:1-2, 5-6, 13-17.) Gevo misstates the record because Dr. Daugulis never testified that any sort of calculations would be necessary to determine where water could be recycled.

Dr. Daugulis, in fact, stated that "[t]he choice of where to recycle the water-rich liquid phase would have been a design choice" and that "it would not have posed a challenge to reconfigure the plant to recycle the water-rich liquid stream to the fermentor." (A545, ¶ 64.) The calculations a POSA would perform when making that choice are "not inherently difficult" even though they do require "[q]uite a bit of calculation." (A1817:17-20.) And as both expert agree, commercial software packages that do these calculations, such as ASPEN and HYSIS, were available to a POSA. (A1818:22-24; A874:4-8.)

The Board's determination that the prior art teaches or suggests returning a water-rich liquid stream to a fermentor is based on substantial evidence. The critical points—that the prior art teaches recycling a water-rich liquid stream to a fermentor, that recycling a water-rich liquid stream to fermentor is a viable option from the recycling choices offered, and that skilled artisan would have a reason and an expectation of success in combing the prior art references—are uncontested.

## II.     Substantial evidence supports the Board's determination that English and Maiorella teach a "pretreatment unit"

Gevo makes two arguments as to how the Board allegedly erred in finding that the prior art taught a "pretreatment unit" (claim 1, step (a)). (Gevo Br. at 20-21.) Both arguments fail for several reasons.

First, Gevo's misreads the Board's decisions. Gevo argues that the Board bootstrapped its finding of what the prior art disclosed to Gevo's acquiescence to the Board's construction of the term "pretreatment unit." (*Id.*) In no part did the Board's decision rest on any perceived acquiescence by Gevo; and notably, Gevo does not provide a citation to this alleged Board error. Nevertheless, a simple review of the Board's conclusion shows that Gevo's argument here is meritless.

Claims 1 and 14 each recite "pretreating a feedstock to form fermentable sugars in a pretreatment unit." (A107-08, claims 1 and 14.) The Board construed the term "pretreatment unit" to mean "the location where the feedstock is pretreated to form fermentable sugars." (A309; A56.) This construction, which establishes the location of the pretreatment unit, is not in dispute and Gevo has never proposed any other construction of this term.

Gevo's argument is that although the prior art discloses pretreating a feedstock to produce sugars, the prior art does not disclose that such pretreatment activity occurs in a pretreatment unit. But as the Board explained, a "pretreatment unit" is nothing more than the location where pretreatment occurs. It is beyond obvious that if pretreatment is occurring, it is occurring somewhere; namely, in a pretreatment unit. That the prior art did not explicitly refer to where that occurred as a "pretreatment unit" is of no import.

Second, Gevo misunderstands the Board's observation that the prior art does not "explicitly illustrate" a pretreatment unit as somehow contradicting the ultimate conclusion that a pretreatment unit was taught. (Gevo Br. at 21.) This argument ignores the Board's underlying factual findings.

The Board found that the prior art, specifically English and Maiorella, explicitly teaches pretreatment. (A56; A66-67.) Gevo never disputed—and it does not dispute now—that English discloses pretreating a feedstock to form fermentable sugars. As the Board correctly recognized, this pretreatment process is disclosed by English. (A56.) For example, English discloses that "[t]he raw materials for the process of the present invention can be any source of carbohydrate material which can be used as a source of sugars, either as a direct source of sugar, or as a material which provides sugar by degradation of starch, cellulose, or other polysaccharides." (A176, English, 2:58-63.) One such pretreating process involves the "[s]accharfication of cellulose-containing feedstocks by one or more enzymes such as cellulose," which the '588 patent explicitly defines as a pretreatment. (A176, English, 2:68-3:3; '588 patent, claims 2 and 15.)

Moreover, both parties' experts agreed that English taught pretreatment. (A543, ¶ 75; A881:25-A882:11.) Based on the record before it, the Board concluded that "the location where carbohydrate feedstock of starch, cellulose, or

other polysaccharides is degraded to produce sugars is the pretreatment unit in English." (A56.)

Maiorella also discloses pretreatment. For example, Maiorella discloses producing alcohol by culturing a microorganism in a fermentor and in a fermentation medium comprising biomass-derived fermentable sugars, obtained by enzymatic hydrolysis of corn stover residue. (A222, Maiorella.) Maiorella explicitly teaches producing a glucose feedstock for fermentation "from corn-stover residue by enzymatic hydrolysis," for example. (*Id*.) Again, both Gevo's and Butamax's expert agree to this teaching. (A561-62, ¶ 107; A891-90, 71:21-72:3.)

Based on that evidence, the Board concluded that "Maiorella teaches producing glucose from corn stover residue by enzymatic hydrolysis and concentrating the sugar solution for fermentation." (A66.) And that "the location of the glucose production is the pretreatment unit in Maiorella." (A66.) Consequently, the Board was "satisfied that Maiorella teaches or suggests step (a) of claims 1 and 14." (A67.) The Board had no problem recognizing the truism that if pretreatment occurs, it occurs somewhere.

## CONCLUSION

This Court should affirm the Board's final decision because substantial evidence supports the its factual determination that the recycling and pretreatment steps are taught or suggested by the prior art. Indeed, there is no evidence to the

contrary. Rather, Gevo either ignores the Board's written decision explicitly

detailing the evidence or attempts to mischaracterize testimony in its favor.

Respectfully submitted,


/s/Deborah A. Sterling
Deborah A. Sterling
Paul A. Ainsworth
Sterne Kessler Goldstein & Fox, PLLC
1100 New York Avenue, NW
Washington, DC 20005
(202) 371-2600


*Counsel for Appellee Butamax Advanced Biofuels, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing BRIEF OF APPELLEE BUTAMAX™

ADVANCED BIOFUELS LLC was electronically filed with the Clerk of the Court

using the CM/ECF system on the 18th Day of June, 2015, which will serve via e-

mail notice of such filing to all counsel of record including:


    Stephen R. Smith, Esq.
    Thomas A. Blinka
    Cooley LLP
    1299 Pennsylvania Ave., NW
    Washington, DC 20004
    Telephone: (202) 842-7800


    I further certify that I will cause six paper copies to be filed with the Court

within five days of the Court's acceptance of the Brief in accordance with ECF-10.

Dated: June 18, 2015

Respectfully submitted,


/s/ Deborah A. Sterling
Deborah A. Sterling
*Counsel for Appellee Butamax Advanced Biofuels, LLC*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of the Federal Rule of

   Appellate Procedure 32(a)(7)(B) or FRAP 28.1(e).

   - The brief contains 5,411 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate

   Procedure 32(a)(5) or FRAP 28.1(e) and the type style requirements of Federal

   Rule of Appellate Procedure 32(a)(6).

   - The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 Point Times New Roman Font.

Dated: June 18, 2015

Respectfully submitted,


/s/ Deborah A. Sterling
Deborah A. Sterling
*Counsel for Appellee Butamax Advanced Biofuels, LLC*